IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 5:19-CR- |
| v. | § | JUDGE |
| | § | |
| PHILIP LAMB (01) | § | **SEALED** |
| NICOLAS ARROYO (02) | § | |
| VINCENT MARCHETTI, JR. (03) | § | |
| WILLIAM FLOWERS (04) | § | |
| STEVEN DONOFRIO (05) | § | |
| JAMES J. WALKER, JR. (06) | § | |
| a/k/a JIMMY WALKER | § | |
| TIMOTHY ARMSTRONG (07) | § | |
| VIRGINIA BLAKE HERRIN (08) | § | |
| PATRICK RIDGEWAY (09) | § | |
| CHISMERE MALLARD (10) | § | |
| RAY W. NG (11) | § | |
| ASHLEY KRETZSCHMAR (12) | § | |

**FILED**

DEC 1 1 2019

Clerk, U.S. District Court
Texas Eastern

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five who are blind or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services (HHS).  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

2.      Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

3.      Medicare is a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), in that it is a plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.

4.      The Medicare payment system is comprised of four parts:  Medicare Part A, which provides, among other things, hospital, home health, and skilled nursing care; Medicare Part B, which provides coverage for outpatient services, such as laboratory, radiology, and therapy; Medicare Part C, which provides managed care coverage; and Medicare Part D, which covers prescription drug benefits.

5.      A Medicare Administrative Contractor (MAC) is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare Part A and Part B claims for Medicare Fee-For-Service beneficiaries.  The MAC also administers the provider enrollment process.  CMS relies on a network of MACs to serve as the primary operational contact between the Medicare program and health care providers enrolled, or seeking to become enrolled, in the program.

6.      For a laboratory to become enrolled in Medicare, it must submit a Medicare enrollment application.  CMS regulates all laboratory testing through the Clinical

Laboratory Improvement Amendments (CLIA) regulations, which establish standards for laboratory testing covered and paid for by Medicare. To register for Medicare and to obtain a certificate of accreditation, the owner of the laboratory must submit an application to HHS. 42 C.F.R. § 493.55. The application must identify the laboratory and provide details about the laboratory's operations. 42 C.F.R. § 493.55(c). Under no circumstances may a person solicit or accept materials from the human body for laboratory examination or other procedure unless there is in effect for the laboratory a certificate issued by HHS allowing those procedures to take place. 42 U.S.C. § 263a(b).

7.    The CLIA regulations define "laboratory" as a "facility for the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." 42 C.F.R. § 493.2. Each laboratory must have appropriate and sufficient equipment, instruments, and supplies for the type and volume of testing it performs. 42 C.F.R. § 493.1101(b).

8.    Once laboratories have received CLIA accreditation, they may apply to Medicare to be a health care provider to receive payment for health care services provided. In submitting an application to Medicare, health care providers certify they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of 42 U.S.C. § 1320a-7b(b), Illegal Remunerations, also known as the Anti-Kickback Statute.

9.      When Medicare approves a provider's application, Medicare issues the provider a unique provider number, known as a National Provider Identifier ("NPI"). Medicare uses the NPI to identify the provider in claims submitted for payment. CMS contracts with MACs to perform all enrollment activities for laboratories.

10.     Upon enrollment, Medicare issues providers a provider manual that describes the requirements to participate in the Medicare program, as well as ongoing newsletters advising them of the additional requirements for participation and instructions on what services Medicare covers. Medicare manuals and other resources are also publically-available online.

11.     CMS also contracts with MACs to administer Medicare Part B claim payments, which includes claims for laboratory services. Each time a laboratory provider submits a claim to Medicare, the laboratory provider certifies the claim is true, correct, and complete, and complies with all Medicare laws and regulations. The claims are generally submitted electronically.

12.     Individuals who qualify for Medicare benefits are commonly referred to as Medicare beneficiaries. Each beneficiary is assigned a Health Insurance Claims Number ("HICN").

13.     A laboratory provider enrolled as a Medicare provider is able to file claims with Medicare to obtain payment for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare HICN, the services performed for the beneficiary, the date the services were provided, the

cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

**Special Fraud Alerts**

14.    In October 1994, the HHS Office of Inspector General (OIG) issued a Special Fraud Alert on Arrangements for the Provision of Clinical Laboratory Services. In the Special Fraud Alert, the OIG posed the question, "How does the Anti-Kickback Statute relate to arrangements for the provision of clinical lab services?" The OIG's answer, in part, was the following:

> Whenever a laboratory offers or gives to a source of referrals source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from the laboratory.

15.    On June 25, 2014, the OIG issued a Special Fraud Alert on Laboratory Payments to Referring Physicians. In the Special Fraud Alert, the OIG highlighted its concerns with arrangements in which the amounts paid to a referral source take into account the volume or value of business generated by the referral source, as follows:

> Arrangements in which laboratories provide free or below-market goods or services to physicians or make payments to physicians that are not commercially reasonable in the absence of Federal health care program referrals potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition. This is because such transfers of value may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that provides the best, most clinically appropriate service. Such transfers of value also may induce physicians to order more laboratory tests than are medically necessary, particularly when the transfers of value are tied to, or take into account, the volume or value of business generated by the physician. We are particularly concerned about

these types of arrangements because the choice of laboratory, as well as the decision to order laboratory tests, typically is made or strongly influenced by the physician, with little or no input from patients.

**PGx Testing**

16.     Pharmacogenetic ("PGx") testing, also known as pharmacogenomic testing, is a type of genetic testing that identifies genetic variations that effect how an individual patient metabolizes certain drugs.

**DART Registry**

17.     The Diagnosing Adverse Drug Reactions ("DART") Registry was a clinical trial sponsored by UTC Laboratories, LLC (UTC) d/b/a Renaissance RX ("RenRx").  It was established in October 2013.

18.     The DART Registry was designed to assess whether the use of PGx data results in a meaningful change in a subject's drug or dose regimen.  In addition, the DART Registry was intended to evaluate the relationship between adverse drug reactions (ADR) and genotype and assessed resource utilization (emergency department visits and hospitalizations) associated with ADR.

**The Defendants and Associated Companies**

19.     **Philip Lamb** resided in or around Scottsdale, Arizona.

20.     **Nicolas Arroyo** resided in or around Chandler, Arizona; Tempe, Arizona; and Orange County, California.

21.     Genetic Technological Innovations, LLC (GTI) was a Delaware limited liability company.  It was formed on September 12, 2013.  On April 4, 2014, GTI registered in California as a foreign limited liability company.  The company is currently

active.  **Philip Lamb** was the Chief Financial Officer.  **Nicolas Arroyo** was the Chief Executive Officer.  GTI was headquartered in Irvine, California.

22.  Vantari Medical, LLC d/b/a Vantari Genetics, LLC (Vantari) was an Arizona limited liability company.  It was formed on September 9, 2011.  On August 7, 2013, Vantari registered in California as a foreign limited liability company.  The company is currently inactive.

23.  Vantari was a laboratory provider headquartered in Irvine, California.  It maintained a distribution center in Tempe, Arizona.  **Philip Lamb** was the Chief Financial Officer.  **Nicolas Arroyo** was the Chief Executive Officer.

24.  KNM Global, LLC (KNM Global) was a Delaware limited liability company.  Formed on July 9, 2014, the company is currently inactive.

25.  Codon DX Services, LP (Codon) was a California limited partnership. Formed on February 24, 2015, the company is currently inactive.

26.  **Vincent Marchetti, Jr.** resided in or around Scottsdale, Arizona.

27.  **William Flowers** resided in or around Houston, Texas.

28.  Advanced Life Sciences, LLC (ALS) was an Arizona limited liability company.  Formed on March 1, 2013, the company is currently active.  **Vincent Marchetti, Jr.** is the Managing Member.  **William Flowers** is a Member.

29.  Vivo Holdings, LLC (Vivo) was a Delaware limited liability company.  It was formed on July 14, 2014.  On September 30, 2014, Vivo registered in Arizona as a foreign limited liability company.  The company is currently active.  **Vincent Marchetti, Jr.** and **William Flowers** are Members.

30.     Vivus Holdings, LLC (Vivus) was a Delaware limited liability company.  It was formed on September 10, 2014.  On September 30, 2014, Vivus registered in Arizona as a foreign limited liability company.  The company is currently active. **Vincent Marchetti, Jr.** and **William Flowers** are Members.

31.     **Steven Donofrio** resided in or around Temecula, California.

32.     Genematrix, LLC (Genematrix) was a Nevada limited liability company. Formed on April 15, 2014, the company is currently active.

33.     **James J. Walker, Jr. a/k/a Jimmy Walker** resided in or around Frisco, Texas.

34.     FLO Vascular, LLC (FLO Vascular) was a Texas limited liability company. Formed on October 8, 2010, the company is currently active.  **Jimmy Walker** is the Managing Member and registered agent.

35.     **Timothy Armstrong** resided in or around Frisco, Texas.

36.     Universal Medical Testing, LLC (UMT) was a Nevada limited liability company.  Formed on November 22, 2013, the company is currently active.  **Timothy Armstrong** was a principal.

37.     **Virginia Blake Herrin** resided in or around Frisco, Texas.

38.     VBH Medical Testing, LLC (VBH) was a Texas limited liability company. Formed on October 9, 2014, the company is currently inactive.  **Virginia Blake Herrin** was the Managing Member.

39.     **Patrick Ridgeway** resided in or around Jackson, Mississippi.

40.     UTC Laboratories, LLC (UTC) d/b/a Renaissance RX ("RenRx") was a Louisiana limited liability company.  It was formed on June 21, 2012.  On October 24, 2014, UTC reorganized as a Delaware limited liability company.  On October 31, 2014, UTC registered in Louisiana as a foreign limited liability company.  The company is currently active.

41.     RenRx was a laboratory provider headquartered in New Orleans, Louisiana. **Patrick Ridgeway** was a principal.

42.     On December 23, 2014, RenRx received a "Notice of Suspension of Medicare Payments" based on "credible allegations of fraud."  The CMS suspension notice advised that the suspension of RenRx's Medicare payments took effect on December 22, 2014.  RenRx remained under a Medicare payment suspension until September 30, 2019, when it was excluded from Medicare, Medicaid, and all other federal health care programs for a period of 25 years.

43.     **Chismere Mallard** resided in or around Mission, Texas.

44.     CLS Devices, LLC (CLS Devices) was a Texas limited liability company. Formed on April 22, 2014, the company is currently inactive.  **Chismere Mallard** was the Managing Member.

45.     **Ray W. Ng** resided in or around Dallas, Texas.

46.     **Ashley Kretzschmar** resided in or around Aledo, Texas

47.     Unindicted Co-conspirator 1 resided in or around Phoenix, Arizona, and Orange County, California.

48.     Unindicted Co-conspirator 2 resided in or around Friendswood, Texas.

49.     Unindicted Co-conspirator 3 resided in or around Lubbock, Texas, and McKinney, Texas.

50.     Distributor 1 was a Texas limited liability company.  Formed on February 26, 2013, the company is currently active.  Unindicted Co-conspirator 3 was the Managing Member.

51.     Company 1 was a Texas limited liability company.  Formed on October 10, 2007, the company is currently active.  Unindicted Co-conspirator 3 was a Managing Member.

52.     Unindicted Co-conspirator 4 resided in or around McAllen, Texas.

53.     Unindicted Co-conspirator 5 resided in or around Lubbock, Texas.

54.     Unindicted Co-conspirator 6 resided in or around Parker, Texas.

55.     Distributor 2 was a Texas limited liability company.  Formed on June 19, 2008, the company is currently active.  Unindicted Co-conspirator 4 and Unindicted Co-conspirator 5 were Members.

56.     Laboratory 1 was a laboratory provider headquartered in Fountain Valley, California.

57.     Laboratory 2 was a laboratory provider headquartered in San Diego, California.

## COUNT 1

Violation:  18 U.S.C. § 371
(Conspiracy to Commit Illegal
Remunerations)

1.      The General Allegations sections of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

2.      From in or around September 2012, and continuing thereafter until or about

June 2017, the exact dates being unknown, in the Eastern District of Texas, and

elsewhere, the defendants, **Philip Lamb**, **Nicolas Arroyo**, **Vincent Marchetti, Jr.**,

**William Flowers**, **Steven Donofrio**, **James J. Walker, Jr. a/k/a Jimmy Walker**,

**Timothy Armstrong**, **Virginia Blake Herrin**, **Patrick Ridgeway**, **Chismere Mallard**,

**Ray W. Ng**, and **Ashley Kretzschmar**, knowingly and willfully conspired and agreed

with others, both known and unknown to the Grand Jury, to commit and abet certain

offenses against the United States:

      a.      to violate the Anti-Kickback statute by knowingly and willfully

soliciting or receiving any remuneration, including any kickback,

directly or indirectly, overtly or covertly, in cash or in kind, in return

for referring Medicare beneficiaries to a person for the furnishing or

arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health

care program, namely the Medicare program, in violation of 42

U.S.C. § 1320a-7b(b)(1)(A);

b.    to violate the Anti-Kickback statute by knowingly and willfully soliciting or receiving any remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, namely the Medicare program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(B);

c.    to violate the Anti-Kickback statute by knowingly and willfully offering or paying remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce the referral of Medicare beneficiaries for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, namely the Medicare program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A); and

d.    to violate the Anti-Kickback statute by knowingly and willfully offering or paying remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce the purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal

health care program, namely the Medicare program, in violation of

42 U.S.C. § 1320a-7b(b)(2)(B).

### Object of the Conspiracy

3.      It was the object of the conspiracy for the defendants, **Philip Lamb**,

**Nicolas Arroyo**, **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, **James J.**

**Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**,

**Patrick Ridgeway**, **Chismere Mallard**, **Ray W. Ng**, and **Ashley Kretzschmar**, and

their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks

in exchange for the referral of and arranging for health care business for which payment

may be made in whole or in part under the Medicare program, to conceal the kickback

arrangement, and to use the kickbacks and the proceeds of the kickback arrangement for

their personal benefit, as well as that of others.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought

to accomplish the object and purpose of the conspiracy included, among others, the

following:

4.      Vantari was a laboratory in California which specialized in PGx testing.

5.      Vantari utilized a network of distributors to market PGx tests to physicians

throughout the United States.

6.      **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, **James J.**

**Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**,

**Patrick Ridgeway**, Unindicted Co-conspirator 3, Unindicted Co-conspirator 4, and

Unindicted Co-conspirator 5, individually and through their companies, generated

business for Vantari in exchange for kickback payments, namely payments that were

determined in a manner that took into account the volume or value of any referrals or

business otherwise generated between the parties for which payment may be made in

whole or in part under the Medicare, Medicaid, or other Federal health care programs.

Likewise, other distributors also generated business for Vantari in exchange for kickback

payments.

7.     The distributors secured referrals for tests, provided specimen collectors,

and trained physicians' office staff on DNA collection, which involved a swab of a

patient's cheek, clinically referred to as a buccal swab.  Many of the distributors had sub-

distributors or marketing representatives, such as **Chismere Mallard**, **Ashley**

**Kretzschmar**, Unindicted Co-conspirator 2, and others who contracted with them.

8.     After receiving PGx referrals from their distributors, Vantari submitted

claims to Medicare and private insurance carriers, first through Laboratory 1, then

through GTI, and later through Laboratory 2.  A summary of the amounts billed to and

paid by Medicare are as follows:

        a.     Laboratory 1 billed Medicare at least $18,307,248 for PGx tests

        generated by Vantari.  Medicare paid Laboratory 1 at least $3,858,776 for

        those tests.

        b.     Medicare was billed $18,855,721 for PGx tests generated by

        **Vincent Marchetti, Jr.** and **William Flowers** through ALS.  Medicare

        paid $3,770,365 for those tests.

c.     Medicare was billed $5,607,595 for PGx tests generated by **Vincent Marchetti, Jr.** and **William Flowers** through Vivo.  Medicare paid $1,165,664 for those tests.

d.     Medicare was billed $15,941,100 for PGx tests generated by **Steven Donofrio** through Genematrix.  Medicare paid $3,120,940 for those tests.

e.     Medicare was billed $19,027,583 for PGx tests generated by **Jimmy Walker** through FLO Vascular.  Medicare paid $4,067,168 for those tests.

    i.     Medicare was billed $862,050 for PGx tests referred by **Ray W. Ng**.  Medicare paid $204,130 for those tests.

    ii.     Medicare was billed $1,763,697 for PGx tests referred by Unindicted Co-conspirator 6.  Medicare paid $92,993 for those tests.

f.     Medicare was billed $7,020,712 for PGx tests generated by Unindicted Co-conspirator 3 through Distributor 1.  Medicare paid $1,512,297 for those tests.

g.     Medicare was billed $16,760,179 for PGx tests generated by Unindicted Co-conspirator 3, Unindicted Co-conspirator 4, and Unindicted Co-conspirator 5, through Distributor 2.  Medicare paid $3,307,840 for those tests.

    i.     Medicare was billed $9,630,089 for PGx tests generated by **Chismere Mallard** through CLS Devices.  Medicare paid $1,853,521 for those tests.

h.     Medicare was billed $3,496,753 for PGx tests generated by **Timothy Armstrong** and **Virginia Blake Herrin** through UMT.  Medicare paid $727,903 for those tests.

i.     Medicare was billed $8,529,407 for PGx tests generated by **Timothy Armstrong** and **Virginia Blake Herrin** through VBH.  Medicare paid $1,736,182 for those tests.

j.     Medicare was billed more than $3,367,271 for PGx tests generated by Unindicted Co-conspirator 2.  Medicare paid more than $666,571 for those tests.

k.     Medicare was billed $491,998 for PGx tests generated by **Ashley Kretzschmar**.  Medicare paid $92,993 for those tests.

9.     Vantari paid its distributors a percentage of net collected reimbursements for the referral of and arranging for health care business.  Net collected reimbursements were defined as payments actually received by Vantari from Medicare and private insurance carriers.

10.    At some point, Vantari changed its commission structure whereby distributors were paid a percentage of net collected non-federal reimbursements.  Net collected non-federal reimbursements were defined as payments actually received by Vantari from any commercial insurance carrier or private payer.

11.    Vantari continued to pay distributors for the referral of and arranging for health care business for which payment may be made in whole or in part under the

Medicare program under the guise of activity reports which purported to compensate contractor representatives for various activities performed for the benefit of Vantari.

12.     Vantari recorded all of the PGx test referrals in order to document the particular distributor who was responsible for each particular referral.  This allowed Vantari to assign, pay, and track commissions to its various distributors.

13.     The distributors paid their sub-distributors for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

14.     A summary of the amounts paid to the distributors and their sub-distributors for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program are as follows:

       a.     Laboratory 1 paid Vantari more than $1,686,229.20.

       b.     Vantari paid ALS and its principals, **Vincent Marchetti, Jr.** and **William Flowers**, $6,316,270.56.

           i.     ALS and its principals, **Vincent Marchetti, Jr.** and **William Flowers**, paid KNM Global and its principals, **Nicolas Arroyo** and Unindicted Co-conspirator 1, $234,504.88.

       c.     Vantari paid Vivo and its principals, **Vincent Marchetti, Jr.** and **William Flowers**, $1,811,197.10.

           i.     Vivo and its principals, **Vincent Marchetti, Jr.** and **William Flowers**, paid KNM Global and its principals, **Nicolas Arroyo** and Unindicted Co-conspirator 1, $97,631.64.

d.      Vantari paid Genematrix and its principal, **Steven Donofrio**, $2,642,910.54.

e.      Vantari paid FLO Vascular and its principal, **Jimmy Walker**, $1,637,057.76.

   i.      **Jimmy Walker** paid **Ray W. Ng** more than $20,000.

   ii.     **Jimmy Walker** paid Unindicted Co-conspirator 6 more than $30,000.

f.      Vantari paid Distributor 1 and its principal, Unindicted Co-conspirator 3, $340,267.

g.      Vantari paid Distributor 2 and its principals, Unindicted Co-conspirator 4 and Unindicted Co-conspirator 5, $2,032,637.55.

   i.      Unindicted Co-conspirator 4 and Unindicted Co-conspirator 5 paid CLS Devices and its principal, **Chismere Mallard**, $710,058.01.

h.      Vantari paid UMT and its principals, **Timothy Armstrong** and **Virginia Blake Herrin**, $268,869.29.

i.      Vantari paid VBH and its principals, **Timothy Armstrong** and **Virginia Blake Herrin**, $1,880,690.80.

j.      **Timothy Armstrong** and **Virginia Blake Herrin** paid Unindicted Co-conspirator 2 $238,646.33.

k.      Vantari paid **Ashley Kretzschmar** $51,069.33.

l.      Vantari paid RenRx $8,250,000.

m.    Laboratory 2 paid Codon $109,875.20 and paid Genematrix more than $171,342.42. Genematrix, in turn, paid Codon $16,584.96 and ALS $24,943.34.

15.    At times, distributors, such as **James J. Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**, and Unindicted Co-conspirator 3, and sub-distributors, such as **Chismere Mallard**, paid physicians, relatives of physicians, or representatives of physicians for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

16.    At times, Vantari paid relatives of physicians or representatives of physicians, such as **Ashley Kretszschmar**, for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

17.    At times, relatives of physicians, such as **Ashley Kretszschmar** and Unindicted Co-conspirator 2, received payments for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program, including the referral of and arranging for health care business from their physician relatives.

18.    At times physicians, such as **Ray N. Ng** and Unindicted Co-conspirator 6, received payments for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

19.    At times distributors, such as **James J. Walker, Jr. a/k/a Jimmy Walker** and Unindicted Co-conspirator 3, made kickback payments to physicians under the guise

of research grants which purported to compensate physicians for various activities related to medical research but in reality were nothing more than a method by which to account for kickbacks paid to physicians.

20.     Other laboratories, such as Laboratory 1, RenRx, and Laboratory 2, participated in Vantari's kickback arrangement in a variety of ways.

21.     Vantari, through its principals, **Nicolas Arroyo** and Unindicted Co-conspirator 1, entered into an arrangement with Laboratory 1 whereby Vantari acted as a distributor for Laboratory 1.  Vantari's distributors acted as sub-distributors for Vantari. Laboratory 1 paid Vantari for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.  Vantari in turn paid its distributors for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

22.     Vantari entered into an arrangement with RenRx whereby RenRx acted as a distributor for Vantari.  Vantari paid RenRx for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.  **Nicolas Arroyo** and **Philip Lamb** facilitated the arrangement on behalf of Vantari.  **Patrick Ridgeway** facilitated the arrangement on behalf of RenRx.  **Nicolas Arroyo, Philip Lamb**, **Patrick Ridgeway**, and others devised a contracted payment arrangement to disguise the kickbacks.

23.     Vantari entered into an arrangement with Laboratory 2 whereby Vantari, acting through **Nicolas Arroyo**, Unindicted Co-conspirator 1, and Codon, and several of Vantari's distributors, such as ALS, Vivo, and Genematrix acted as distributors, directly

or indirectly, for Laboratory 2.  Laboratory 2 paid the distributors, directly or indirectly, for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.  **Nicolas Arroyo** and Unindicted Co-conspirator 1 facilitated the arrangement on behalf of Codon.  **Vincent Marchetti, Jr.** and **William Flowers** facilitated the arrangement on behalf of ALS and Vivo.  **Steven Donofrio** facilitated the arrangement on behalf of Genematrix.

**Overt Acts**

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Eastern District of Texas and elsewhere:

**Vantari and Laboratory 1**

24.     On or about September 27, 2012, Vantari, through its principals, **Nicolas Arroyo** and Unindicted Co-conspirator 1, entered into a written agreement with Laboratory 1 for the referral and arranging for health care business for which payment may be made in whole or in part under the Medicare program.  Vantari acted as a distributor for Laboratory 1.  Vantari's distributors acted as sub-distributors for Vantari. According to the agreement, Vantari would receive 50% of reimbursements received by Laboratory 1 for Vantari-generated referrals.  Vantari, in turn, paid its distributors for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program.

25.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, Laboratory 1 knowingly and willfully paid

remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Vantari to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Nicolas Arroyo** and others, acting through Vantari, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 3/1/2013 | $5,078.99 | Vantari |
| b. | 3/14/2013 | $7,042.39 | Vantari |
| c. | 6/7/2013 | $19,029.65 | Vantari |
| d. | 6/17/2013 | $190,817.42 | Vantari |
| e. | 8/5/2013 | $58,873.32 | Vantari |
| f. | 8/17/2013 | $805.04 | Vantari |
| g. | 8/20/2013 | $37,496.14 | Vantari |
| h. | 9/5/2013 | $51,272.51 | Vantari |
| i. | 9/19/2013 | $37,933.38 | Vantari |
| j. | 9/19/2013 | $50,918.22 | Vantari |
| k. | 9/26/2013 | $3,933.71 | Vantari |
| l. | 10/3/2013 | $128,639.32 | Vantari |
| m. | 10/21/2013 | $155,527.55 | Vantari |
| n. | 10/29/2013 | $92,886.07 | Vantari |
| o. | 11/5/2013 | $22,292.75 | Vantari |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| p. | 11/15/2013 | $110,841.95 | Vantari |
| q. | 11/22/2013 | $358,064.22 | Vantari |
| r. | 12/2/2013 | $94,510.91 | Vantari |
| s. | 12/10/2013 | $148,852.61 | Vantari |
| t. | 12/30/2013 | $111,413.05 | Vantari |

**Vincent Marchetti, Jr. and William Flowers**

ALS

26.     On or about January 9, 2014, ALS entered into a written agreement with Vantari for the referral of and arranging for health care business. According to the agreement, ALS would receive 35% of reimbursements received by Vantari for ALS-generated referrals.

27.     On or about July 11, 2014, the agreement was amended and the amount was increased to 50% of reimbursements received by Vantari for ALS-generated referrals.

28.     On or about September 2, 2014, the agreement was amended. According to the amended agreement, ALS would receive 50% of net collected non-federal reimbursements received by Vantari for ALS-generated referrals, plus a monthly payment of $0 for each "'active' Contractor Representative."

29.     On or about September 8, 2014, the agreement was verbally amended. The percentage reimbursement remained the same. A monthly payment of $3,000 times fifteen "'active' Contractor Representatives" or $45,000 was added.

30.     On or about September 1, 2015, the agreement was amended.  According to the amended agreement, ALS would receive 47.5% of net collected non-federal reimbursements received by Vantari for ALS-generated referrals, plus a monthly payment of $3,000 for each "'active' Contractor Representative."

31.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to ALS to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Vincent Marchetti, Jr.** and **William Flowers**, acting through ALS, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 3/17/2014 | $582.82 | ALS |
| b. | 4/11/2014 | $7,326.71 | ALS |
| c. | 5/15/2014 | $11,178.27 | ALS |
| d. | 6/16/2014 | $17,773.39 | ALS |
| e. | 7/15/2014 | $29,104.72 | ALS |
| f. | 7/24/2014 | $93.28 | ALS |
| g. | 9/4/2014 | $75,000.00 | ALS |
| h. | 9/8/2014 | $186,628.59 | ALS |
| i. | 10/15/2014 | $5,000.00 | ALS |
| j. | 10/15/2014 | $186,778.10 | ALS |
| k. | 11/4/2014 | $959.60 | ALS |
| l. | 11/12/2014 | $303,944.63 | ALS |
| m. | 12/15/2014 | $279,766.71 | ALS |
| n. | 1/15/2015 | $315,251.77 | ALS |
| o. | 2/13/2015 | $406,324.37 | ALS |
| p. | 3/16/2015 | $301,417.81 | ALS |
| q. | 4/15/2015 | $285,916.90 | ALS |
| r. | 5/15/2015 | $344,613.20 | ALS |
| s. | 6/11/2015 | $312,057.25 | ALS |
| t. | 7/14/2015 | $498,569.99 | ALS |
| u. | 8/12/2015 | $249,792.01 | ALS |
| v. | 8/19/2015 | $124,705.27 | ALS |
| w. | 9/15/2015 | $175,984.22 | ALS |
| x. | 10/15/2015 | $211,634.73 | ALS |
| y. | 11/13/2015 | $185,576.40 | ALS |
| z. | 12/15/2015 | $236,614.76 | ALS |
| aa. | 1/15/2016 | $317,468.40 | ALS |
| bb. | 2/12/2016 | $244,883.30 | ALS |
| cc. | 3/15/2016 | $167,278.12 | ALS |
| dd. | 4/15/2016 | $138,206.37 | ALS |
| ee. | 5/13/2016 | $185,997.24 | ALS |
| ff. | 6/15/2016 | $125,389.47 | ALS |
| gg. | 7/19/2016 | $83,184.27 | ALS |
| hh. | 7/20/2016 | $75,000.00 | ALS |
| ii. | 8/15/2016 | $93,866.82 | ALS |
| jj. | 9/15/2016 | $104,504.90 | ALS |
| kk. | 10/14/2016 | $27,896.17 | ALS |

32.     On or about July 11, 2014, after Vantari raised the ALS referral

reimbursement rate from 35% to 50%, ALS began to pay a percentage of reimbursements

received from Vantari to KNM Global, a company controlled by **Nicolas Arroyo** and

Unindicted Co-conspirator 1.  KNM Global was unknown to **Philip Lamb**.  The

percentage paid to KNM Global varied by month as follows:

| Month and Year | Percentage |
|----------------|------------|
| September 2014 | 5.06% |
| November 2014 | 14.16% |
| December 2014 | 9.59% |
| January 2015 | 9.68% |
| February 2015 | 10.39% |
| March 2015 | 8.57% |
| April 2015 | 10.63% |
| May 2015 | 4.01% |
| **Average** | **9.01%** |

33.     On or about the dates specified below in the payment date column, to the

particular entity or individual specified, and in the amounts specified, a portion of which

constituted illegal remunerations, **Vincent Marchetti, Jr.** and **Williams Flowers**, acting

through ALS, knowingly and willfully paid remuneration, including any kickback,

directly and indirectly, overtly and covertly, in cash and in kind, to KNM Global in return

for arranging for the ordering of any service and item for which payment may be made in

whole and in part under the Medicare program; and **Nicolas Arroyo** and Unindicted Co-

conspirator 1, acting through KNM Global, knowingly and willfully received

remuneration, including any kickback, directly and indirectly, overtly and covertly, in

cash and in kind, in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 8/1/2014 | $2,910.47 | KNM Global |
| b. | 8/21/2014 | $5,585.53 | KNM Global |
| c. | 9/17/2014 | $13,231.43 | KNM Global |
| d. | 11/26/2014 | $43,178.90 | KNM Global |
| e. | 12/19/2014 | $26,821.49 | KNM Global |
| f. | 1/23/2015 | $30,524.91 | KNM Global |
| g. | 2/23/2015 | $42,205.47 | KNM Global |
| h. | 3/20/2015 | $25,828.54 | KNM Global |
| i. | 4/22/2015 | $30,405.58 | KNM Global |
| j. | 5/22/2015 | $13,812.56 | KNM Global |

Vivo

34.    On or about August 20, 2014, Vivo entered into a written agreement with Vantari for the referral of and arranging for health care business.  According to the agreement, Vivo would receive 50% of net collected non-federal reimbursements received by Vantari for Vivo-generated referrals, plus a monthly payment of $0 for each "'active' Contractor Representative."

35.    On or about September 1, 2015, the agreement was amended.  According to the amended agreement, Vivo would receive 45% of net collected non-federal reimbursements received by Vantari for Vivo-generated referrals, plus a monthly payment of $0 for each "'active' Contractor Representative."

36.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting

Indictment – Page 27

through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Vivo to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Vincent Marchetti, Jr.** and **William Flowers**, acting through Vivo, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 10/15/2014 | $52,094.47 | Vivo |
| b. | 11/12/2014 | $116,972.61 | Vivo |
| c. | 12/15/2014 | $138,745.08 | Vivo |
| d. | 1/15/2015 | $203,422.82 | Vivo |
| e. | 2/13/2015 | $130,656.27 | Vivo |
| f. | 3/16/2015 | $116,098.68 | Vivo |
| g. | 4/15/2015 | $132,970.83 | Vivo |
| h. | 5/15/2015 | $87,637.86 | Vivo |
| i. | 6/15/2015 | $91,331.95 | Vivo |
| j. | 7/14/2015 | $156,675.87 | Vivo |
| k. | 8/12/2015 | $63,446.44 | Vivo |
| l. | 8/19/2015 | $4,800.50 | Vivo |
| m. | 9/15/2015 | $63,385.33 | Vivo |
| n. | 10/15/2015 | $69,323.09 | Vivo |
| o. | 11/13/2015 | $81,468.65 | Vivo |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| p. | 12/15/2015 | $65,086.22 | Vivo |
| q. | 1/15/2016 | $37,086.60 | Vivo |
| r. | 2/12/2016 | $71,442.25 | Vivo |
| s. | 3/15/2016 | $44,105.34 | Vivo |
| t. | 4/15/2016 | $10,865.14 | Vivo |
| u. | 5/13/2016 | $3,093.83 | Vivo |
| v. | 5/13/2016 | $19,338.39 | Vivo |
| w. | 6/15/2016 | $13,209.69 | Vivo |
| x. | 6/21/2016 | $3,844.24 | Vivo |
| y. | 7/19/2016 | $15,803.75 | Vivo |
| z. | 8/15/2016 | $1,195.19 | Vivo |
| aa. | 8/24/2016 | $1,695.96 | Vivo |
| bb. | 9/15/2016 | $12,426.54 | Vivo |
| cc. | 10/14/2016 | $2,973.51 | Vivo |

37.     On or about August 20, 2014, Vivo began to pay a percentage of reimbursements received from Vantari to KNM Global, a company controlled by **Nicolas Arroyo** and Unindicted Co-conspirator 1. KNM Global was unknown to **Philip Lamb**. The percentage paid to KNM Global varied by month as follows:

| Month and Year | Percentage |
|---|---|
| October 2014 | 10.00% |
| November 2014 | 10.00% |
| December 2014 | 10.00% |
| January 2015 | 10.00% |
| February 2015 | 10.00% |
| March 2015 | 10.00% |
| April 2015 | 10.00% |
| May 2015 | 9.74% |
| **Average** | **9.97%** |

38.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Vincent Marchetti, Jr.** and **Williams Flowers**, acting

Indictment – Page 29

through Vivo, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to KNM Global in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Nicolas Arroyo** and Unindicted Co-conspirator 1, acting through KNM Global, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 10/21/2014 | $5,209.45 | KNM Global |
| b. | 11/18/2014 | $11,697.26 | KNM Global |
| c. | 12/19/2014 | $13,874.51 | KNM Global |
| d. | 1/20/2015 | $20,344.28 | KNM Global |
| e. | 2/18/2015 | $13,063.63 | KNM Global |
| f. | 3/17/2015 | $11,609.87 | KNM Global |
| g. | 4/21/2015 | $13,297.08 | KNM Global |
| h. | 5/21/2015 | $8,535.56 | KNM Global |

**Steven Donofrio and Genematrix**

39.     On or about April 21, 2014, Genematrix entered into a written agreement with Vantari for the referral of and arranging for health care business.  According to the agreement, Genematrix would receive 35% of reimbursements received by Vantari for Genematrix-generated referrals.

40.     On or about May 20, 2015, the agreement was amended.  According to the amended agreement, Genematrix would receive 35% of net collected non-federal

reimbursements received by Vantari for Genematrix-generated referrals, plus a monthly payment of $3,000 for each "'active' Contractor Representative."

41.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Genematrix to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Steven Donofrio**, acting through Genematrix, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 7/15/2014 | $32,906.49 | Genematrix |
| b. | 8/1/2014 | $53,885.13 | Genematrix |
| c. | 8/15/2014 | $37,718.47 | Genematrix |
| d. | 9/4/2014 | $75,000.00 | Genematrix |
| e. | 12/15/2014 | $47,371.98 | Genematrix |
| f. | 12/18/2014 | $7,251.72 | Genematrix |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| g. | 1/15/2015 | $69,857.04 | Genematrix |
| h. | 2/17/2015 | $50,000.00 | Genematrix |
| i. | 2/17/2015 | $57,567.47 | Genematrix |
| j. | 3/16/2015 | $65,398.74 | Genematrix |
| k. | 5/15/2015 | $194,991.19 | Genematrix |
| l. | 6/15/2015 | $176,836.88 | Genematrix |
| m. | 7/16/2015 | $269,149.53 | Genematrix |
| n. | 8/19/2015 | $74,706.65 | Genematrix |
| o. | 9/15/2015 | $106,754.37 | Genematrix |
| p. | 10/15/2015 | $57,864.56 | Genematrix |
| q. | 11/13/2015 | $38,792.54 | Genematrix |
| r. | 12/15/2015 | $40,855.12 | Genematrix |
| s. | 1/15/2016 | $17,676.27 | Genematrix |
| t. | 2/12/2016 | $16,631.02 | Genematrix |
| u. | 3/15/2016 | $13,001.20 | Genematrix |
| v. | 4/15/2016 | $8,280.98 | Genematrix |
| w. | 5/13/2016 | $8,423.35 | Genematrix |
| x. | 6/15/2016 | $7,011.82 | Genematrix |
| y. | 7/19/2016 | $4,121.16 | Genematrix |
| z. | 8/15/2016 | $2,269.17 | Genematrix |
| aa. | 9/15/2016 | $3,411.57 | Genematrix |
| bb. | 11/15/2016 | $3,060.22 | Genematrix |
| cc. | 12/15/2016 | $845.74 | Genematrix |
| dd. | 1/17/2017 | $858.22 | Genematrix |
| ee. | 2/15/2017 | $1,654.00 | Genematrix |
| ff. | 3/15/2017 | $254.45 | Genematrix |
| gg. | 4/14/2017 | $1,752.83 | Genematrix |
| hh. | 5/15/2017 | $13,753.20 | Genematrix |
| ii. | 6/6/2017 | $50,000.00 | Genematrix |
| jj. | 6/15/2017 | $6,238.14 | Genematrix |

### Jimmy Walker and FLO Vascular

42.     On or about November 5, 2012, FLO Vascular entered into a written agreement with Vantari for the referral of and arranging for health care business.

According to the agreement, FLO Vascular would receive $100 for each FLO Vascular-generated referral.

43.     In or around February 2013, the agreement was amended and the amount was increased to 28% of reimbursements received by Vantari for FLO Vascular-generated referrals.

44.     In or around June 2013, the agreement was amended and the amount was increased to 35% of reimbursements received by Vantari for FLO Vascular-generated referrals.

45.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Jimmy Walker** and FLO Vascular to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Jimmy Walker**, individually and acting through FLO Vascular, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for

arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 1/14/2013 | $1,000.00 | Jimmy Walker |
| b. | 1/9/2013 | $1,000.00 | Jimmy Walker |
| c. | 4/17/2013 | $5,000.00 | Jimmy Walker |
| d. | 6/5/2013 | $10,000.00 | FLO Vascular |
| e. | 7/1/2013 | $71,586.75 | FLO Vascular |
| f. | 12/2/2013 | $165,101.62 | FLO Vascular |
| g. | 1/16/2014 | $100,378.56 | FLO Vascular |
| h. | 2/3/2014 | $39,422.42 | FLO Vascular |
| i. | 2/18/2014 | $129,063.80 | FLO Vascular |
| j. | 3/3/2014 | $98,012.54 | FLO Vascular |
| k. | 3/17/2014 | $37,719.50 | FLO Vascular |
| l. | 4/11/2014 | $155,767.00 | FLO Vascular |
| m. | 5/15/2014 | $150,920.24 | FLO Vascular |
| n. | 6/16/2014 | $98,568.52 | FLO Vascular |
| o. | 7/15/2014 | $57,572.48 | FLO Vascular |
| p. | 8/15/2014 | $64,162.86 | FLO Vascular |
| q. | 9/17/2014 | $65,550.54 | FLO Vascular |
| r. | 10/15/2014 | $21,982.10 | FLO Vascular |
| s. | 11/14/2014 | $9,720.92 | FLO Vascular |
| t. | 1/22/2015 | $337,067.28 | FLO Vascular |
| u. | 2/17/2015 | $654.35 | FLO Vascular |
| v. | 3/16/2015 | $7,086.79 | FLO Vascular |
| w. | 4/22/2015 | $4,848.39 | FLO Vascular |
| x. | 5/15/2015 | $3,554.08 | FLO Vascular |
| y. | 6/15/2015 | $1,317.02 | FLO Vascular |

### Jimmy Walker, Ray W. Ng, and Unindicted Co-conspirator 6

46.     **Jimmy Walker** paid physicians, such as **Ray W. Ng** and Unindicted Co-conspirator 6, directly and indirectly, for the referral of and arranging for health care

business for which payment may be made in whole or in part under the Medicare program.

47.    At times, **Jimmy Walker** made kickback payments to physicians under the guise of research grants which purported to compensate physicians for various activities related to medical research but in reality were nothing more than a method by which to account for kickbacks paid to physicians.

Ray W. Ng

48.    **Jimmy Walker** made numerous kickback payments to **Ray W. Ng** in the form of tuition payments to Yale University, the university attended by the **Ray W. Ng's** children.

49.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Jimmy Walker** knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Ray W. Ng** to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Ray W. Ng** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the

Indictment – Page 35

Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 10/3/2014 | $5,000.00 | Yale University |
| b. | 10/3/2014 | $5,000.00 | Yale University |
| c. | 12/31/2014 | $5,000.00 | Yale University |
| d. | 12/31/2014 | $5,000.00 | Yale University |

Unindicted Co-conspirator 6

50.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Jimmy Walker** knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Unindicted Co-conspirator 6 to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and Unindicted Co-Conspirator 6 knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|:---:|:---:|:---:|:---:|
| a. | 2/5/2014 | $2,000.00 | Unindicted Co-conspirator 6 |
| b. | 3/5/2014 | $6,800.00 | Unindicted Co-conspirator 6 |
| c. | 2/17/2014 | $8,900.00 | Unindicted Co-conspirator 6 |
| d. | 4/2/2014 | $1,500.00 | Unindicted Co-conspirator 6 |
| e. | 5/15/2014 | $7,200.00 | Unindicted Co-conspirator 6 |
| f. | 7/21/2014 | $300.00 | Unindicted Co-conspirator 6 |
| g. | 7/21/2014 | $1,800.00 | Unindicted Co-conspirator 6 |
| h. | 8/19/2014 | $1,600.00 | Unindicted Co-conspirator 6 |

**Unindicted Co-conspirator 3**

Distributor 1

51.     On or about November 13, 2013, Distributor 1 entered into a written agreement with Vantari for the referral of and arranging for health care business. According to the agreement, Distributor 1 would receive 22.5% of reimbursements received by Vantari for Distributor 1-generated referrals.

52.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Unindicted Co-conspirator 3, Distributor 1, and Company 1 to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and Unindicted Co-conspirator 3, individually and acting

Indictment – Page 37

through Distributor 1 and Company 1, knowingly and willfully received remuneration,
including any kickback, directly and indirectly, overtly and covertly, in cash and in kind,
in return for referring Medicare beneficiaries for the furnishing and arranging for the
furnishing of any item and service for which payment may be made in whole and in part
under the Medicare program and in return for arranging for the ordering of any service
and item for which payment may be made in whole and in part under the Medicare
program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 6/12/2013 | $10,000.00 | Distributor 1 |
| b. | 7/5/2013 | $17,000.00 | Distributor 1 |
| c. | 1/15/2014 | $18,302.18 | Distributor 1 |
| d. | 1/15/2014 | $2,407.33 | Unindicted Co-conspirator 3 |
| e. | 1/16/2014 | $100.00 | Unindicted Co-conspirator 3 |
| f. | 1/30/2014 | $2,482.33 | Unindicted Co-conspirator 3 |
| g. | 2/3/2014 | $6,240.60 | Distributor 1 |
| h. | 2/14/2014 | $2,886.43 | Unindicted Co-conspirator 3 |
| i. | 2/18/2014 | $15,591.55 | Distributor 1 |
| j. | 2/20/2014 | $1,660.80 | Distributor 1 |
| k. | 2/28/2014 | $2,886.43 | Unindicted Co-conspirator 3 |
| l. | 3/10/2014 | $24,442.04 | Distributor 1 |
| m. | 3/14/2014 | $2,482.33 | Unindicted Co-conspirator 3 |
| n. | 3/25/2014 | $3,983.51 | Distributor 1 |
| o. | 3/28/2014 | $2,886.43 | Unindicted Co-conspirator 3 |
| p. | 4/15/2014 | $14,627.71 | Unindicted Co-conspirator 3 |
| q. | 4/25/2014 | $20,924.07 | Distributor 1 |
| r. | 5/16/2014 | $22,502.52 | Distributor 1 |
| s. | 5/30/2014 | $521.49 | Unindicted Co-conspirator 3 |
| t. | 6/13/2014 | $16,488.46 | Unindicted Co-conspirator 3 |
| u. | 6/16/2014 | $13,004.66 | Distributor 1 |
| v. | 6/17/2014 | $998.82 | Company 1 |

**Unindicted Co-conspirator 3, Unindicted Co-conspirator 4, and
Unindicted Co-conspirator 5**

Distributor 2

53.     On or about February 14, 2014, Distributor 2 entered into a written
agreement with Vantari for the referral of and arranging for health care business.
According to the agreement, Distributor 2 would receive 25% of reimbursements
received by Vantari for Distributor 2-generated referrals.  Unindicted Co-conspirator 3
retained a 5% override on all payments to Distributor 2.

54.     On or about May 15, 2014, the agreement was amended and the amount
was increased to 28% of reimbursements received by Vantari for Distributor 2-generated
referrals with volume incentives of up to 35%.  Unindicted Co-conspirator 3 continued to
retain a 5% override on all payments to Distributor 2.

55.     On or about September 1, 2014, the agreement was amended.   According
to the agreement, Distributor 2 would receive 35% of net collected non-federal
reimbursements received by Vantari for Distributor 2-generated referrals, plus a monthly
payment of $3,000 for each "'active' Contractor Representative."

56.     On or about the dates specified below in the payment date column, to the
particular entity or individual specified, and in the amounts specified, a portion of which
constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting
through Vantari, knowingly and willfully paid remuneration, including any kickback,
directly and indirectly, overtly and covertly, in cash and in kind, to Unindicted Co-
conspirator 3, Distributor 1, Distributor 2, and Company 1 to induce the referral of and

arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and Unindicted Co-conspirator 3, individually and acting through Distributor 1 and Company 1, and Unindicted Co-conspirator 4 and Unindicted Co-conspirator 5, acting through Distributor 2, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 6/18/2014 | $2,397.87 | Distributor 2 |
| b. | 6/20/2014 | $10,371.64 | Distributor 1 |
| c. | 6/30/2014 | $2,811.43 | Unindicted Co-conspirator 3 |
| d. | 7/15/2014 | $37,478.49 | Distributor 2 |
| e. | 7/15/2014 | $24,613.40 | Distributor 1 |
| f. | 7/18/2014 | $2,909.91 | Company 1 |
| g. | 7/21/2014 | $1,422.45 | Distributor 1 |
| h. | 8/15/2014 | $96,773.25 | Distributor 2 |
| i. | 8/15/2014 | $953.36 | Company 1 |
| j. | 9/4/2014 | $75,000.00 | Distributor 2 |
| k. | 9/17/2014 | $19,500.00 | Distributor 2 |
| l. | 10/15/2014 | $61,701.97 | Distributor 2 |
| m. | 10/15/2014 | $1,850.87 | Company 1 |
| n. | 11/14/2014 | $77.50 | Company 1 |
| o. | 11/18/2014 | $170,143.30 | Distributor 2 |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| p. | 12/15/2014 | $57,707.62 | Distributor 2 |
| q. | 12/15/2014 | $134.80 | Company 1 |
| r. | 12/18/2014 | $19,079.75 | Distributor 2 |
| s. | 12/29/2014 | $211.90 | Unindicted Co-conspirator 3 |
| t. | 1/15/2015 | $62,938.59 | Distributor 2 |
| u. | 2/25/2015 | $164,379.52 | Distributor 2 |
| v. | 3/16/2015 | $50,000.00 | Distributor 2 |
| w. | 3/16/2015 | $38,270.10 | Distributor 2 |
| x. | 3/16/2015 | $25,000.00 | Distributor 2 |
| y. | 3/25/2015 | $25,000.00 | Distributor 2 |
| z. | 4/15/2015 | $62,020.84 | Distributor 2 |
| aa. | 4/15/2015 | $25,000.00 | Distributor 2 |
| bb. | 4/22/2015 | $54,182.00 | Distributor 2 |
| cc. | 5/15/2015 | $717.94 | Company 1 |
| dd. | 5/20/2015 | $206,887.31 | Distributor 2 |
| ee. | 6/15/2015 | $174,883.80 | Distributor 2 |
| ff. | 6/15/2015 | $332.49 | Company 1 |
| gg. | 7/16/2015 | $188,437.65 | Distributor 2 |
| hh. | 8/14/2015 | $27,646.87 | Unindicted Co-conspirator 3 |
| ii. | 8/19/2015 | $32,352.23 | Distributor 2 |
| jj. | 8/19/2015 | $9,749.16 | Unindicted Co-conspirator 3 |
| kk. | 8/21/2015 | $931.31 | Unindicted Co-conspirator 3 |
| ll. | 8/21/2015 | $2,793.94 | Unindicted Co-conspirator 3 |
| mm. | 8/25/2015 | $97,485.32 | Distributor 2 |
| nn. | 9/15/2015 | $50,842.51 | Distributor 2 |
| oo. | 10/15/2015 | $59,234.79 | Distributor 2 |
| pp. | 11/13/2015 | $48,050.40 | Distributor 2 |
| qq. | 12/15/2015 | $34,972.45 | Distributor 2 |
| rr. | 1/15/2016 | $43,652.23 | Distributor 2 |
| ss. | 2/12/2016 | $14,778.17 | Distributor 2 |
| tt. | 3/15/2016 | $15,355.25 | Distributor 2 |
| uu. | 4/15/2016 | $4,208.57 | Distributor 2 |
| vv. | 4/21/2016 | $463.08 | Unindicted Co-conspirator 3 |
| ww. | 5/13/2016 | $7,909.11 | Distributor 2 |
| xx. | 5/13/2016 | $9,813.92 | Distributor 1 |
| yy. | 6/15/2016 | $7,014.46 | Distributor 2 |

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|--------------|--------|-------------------|
| zz. | 6/15/2016 | $10,838.03 | Distributor 1 |
| aaa. | 6/21/2016 | $329.35 | Distributor 1 |

**Chismere Mallard and CLS Devices**

57.     In or around May 2014, **Chismere Mallard** entered into an agreement with Distributor 2 for the referral of and arranging for health care business.  According to the agreement, **Chismere Mallard** would receive 22% of reimbursements received by Distributor 2 for referrals which he generated.

58.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, Unindicted Co-conspirator 4 and Unindicted Co-conspirator 5, acting through Distributor 2, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Chismere Mallard** and CLS Devices, to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Chismere Mallard**, individually and acting through CLS Devices, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in

return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 12/30/2013 | $3,000.00 | Chismere Mallard |
| b. | 1/14/2014 | $4,000.00 | Chismere Mallard |
| c. | 1/30/2014 | $4,000.00 | Chismere Mallard |
| d. | 2/14/2014 | $3,500.00 | Chismere Mallard |
| e. | 2/28/2014 | $3,500.00 | Chismere Mallard |
| f. | 3/12/2014 | $6,000.00 | Chismere Mallard |
| g. | 3/28/2014 | $6,000.00 | Chismere Mallard |
| h. | 4/15/2014 | $5,384.05 | Chismere Mallard |
| i. | 4/29/2014 | $4,000.00 | Chismere Mallard |
| j. | 5/15/2014 | $4,110.00 | CLS Devices |
| k. | 5/30/2014 | $5,380.00 | CLS Devices |
| l. | 6/13/2014 | $8,782.56 | CLS Devices |
| m. | 6/17/2014 | $1,274.04 | CLS Devices |
| n. | 6/25/2014 | $9,355.00 | CLS Devices |
| o. | 7/14/2014 | $29,851.46 | CLS Devices |
| p. | 10/7/2014 | $573.20 | CLS Devices |
| q. | 10/7/2014 | $247.14 | CLS Devices |
| r. | 11/5/2014 | $537.50 | CLS Devices |
| s. | 11/5/2014 | $2,300.00 | CLS Devices |
| t. | 12/3/2014 | $9,104.58 | CLS Devices |
| u. | 12/18/2014 | $5,000.00 | CLS Devices |
| v. | 12/11/2014 | $232.75 | Chismere Mallard |
| w. | 1/5/2015 | $3,025.00 | CLS Devices |
| x. | 2/3/2015 | $8,944.51 | CLS Devices |
| y. | 2/6/2015 | $1,939.59 | CLS Devices |
| z. | 3/6/2015 | $4,400.00 | CLS Devices |
| aa. | 3/16/2015 | $43,200.44 | CLS Devices |
| bb. | 3/16/2015 | $7,787.00 | CLS Devices |
| cc. | 3/25/2015 | $9,975.24 | CLS Devices |
| dd. | 4/9/2015 | $4,350.00 | CLS Devices |
| ee. | 4/16/2015 | $43,095.02 | CLS Devices |
| ff. | 4/28/2015 | $8,363.19 | CLS Devices |
| gg. | 5/5/2015 | $4,025.00 | CLS Devices |

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|-------------|--------|-------------------|
| hh. | 5/18/2015 | $42,876.36 | CLS Devices |
| ii. | 5/26/2015 | $4,880.16 | CLS Devices |
| jj. | 6/2/2015 | $3,875.00 | CLS Devices |
| kk. | 6/16/2015 | $39,082.84 | CLS Devices |
| ll. | 6/25/2015 | $6,352.84 | CLS Devices |
| mm. | 7/15/2015 | $46,388.50 | CLS Devices |
| nn. | 7/15/2015 | $3,500.00 | CLS Devices |
| oo. | 8/18/2015 | $34,916.55 | CLS Devices |
| pp. | 8/1/2015 | $5,642.57 | CLS Devices |
| qq. | 8/3/2015 | $3,325.00 | CLS Devices |
| rr. | 9/2/2015 | $9,316.42 | CLS Devices |
| ss. | 9/15/2015 | $20,055.46 | CLS Devices |
| tt. | 9/21/2015 | $2,397.80 | CLS Devices |
| uu. | 9/24/2015 | $22,763.41 | CLS Devices |
| vv. | 9/30/2015 | $2,011.92 | CLS Devices |
| ww. | 10/8/2015 | $5,425.00 | CLS Devices |
| xx. | 10/20/2015 | $33,355.94 | CLS Devices |
| yy. | 11/5/2015 | $6,275.00 | CLS Devices |
| zz. | 11/12/2015 | $20,951.96 | CLS Devices |
| aaa. | 11/16/2015 | $11,653.33 | CLS Devices |
| bbb. | 12/4/2015 | $1,705.06 | CLS Devices |
| ccc. | 12/8/2015 | $6,525.00 | CLS Devices |
| ddd. | 12/14/2015 | $17,177.75 | CLS Devices |
| eee. | 12/22/2015 | $3,074.63 | CLS Devices |
| fff. | 1/11/2016 | $4,637.23 | CLS Devices |
| ggg. | 1/18/2016 | $18,672.39 | CLS Devices |
| hhh. | 1/18/2016 | $1,571.61 | CLS Devices |
| iii. | 2/5/2016 | $8,600.00 | CLS Devices |
| jjj. | 2/16/2016 | $6,703.89 | CLS Devices |
| kkk. | 3/4/2016 | $4,125.00 | CLS Devices |
| lll. | 3/25/2016 | $3,374.16 | CLS Devices |
| mmm. | 4/8/2016 | $6,350.00 | CLS Devices |
| nnn. | 4/21/2016 | $2,502.69 | CLS Devices |
| ooo. | 5/6/2016 | $5,000.00 | CLS Devices |
| ppp. | 5/19/2016 | $1,655.35 | CLS Devices |
| qqq. | 6/10/2016 | $6,525.00 | CLS Devices |
| rrr. | 6/17/2016 | $2,133.99 | CLS Devices |

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|--------------|--------|-------------------|
| sss. | 6/28/2016 | $65.17 | CLS Devices |
| ttt. | 7/12/2016 | $6,100.00 | CLS Devices |
| uuu. | 7/18/2016 | $1,111.27 | CLS Devices |
| vvv. | 8/6/2016 | $6,325.00 | CLS Devices |
| www. | 9/9/2016 | $7,743.09 | CLS Devices |
| xxx. | 10/10/2016 | $7,395.00 | CLS Devices |
| yyy. | 10/25/2016 | $701.40 | CLS Devices |

**Timothy Armstrong and Virginia Blake Herrin**

UMT and VBH

59.     On or about July 24, 2014, UMT entered into a written agreement with Vantari for the referral of and arranging for health care business. According to the agreement, UMT would receive 28% of reimbursements received by Vantari for UMT-generated referrals with volume incentives of up to 35%.

60.     On or about November 1, 2014, UMT entered into an agreement with Vantari for the referral of and arranging for health care business. According to the agreement, UMT would receive 35% of net collected non-federal reimbursements received by Vantari for UMT-generated referrals, plus a monthly payment of $1,500 for each "'active' Contractor Representative."

61.     On or about December 8, 2014, VBH entered into an agreement with Vantari for the referral of and arranging for health care business. According to the agreement, VBH would receive 35% of net collected non-federal reimbursements received by Vantari for VBH-generated referrals, plus a monthly payment of $1,500 for each "'active' Contractor Representative."

62.     On or about May 28, 2015, the agreement was amended and the amount was increased to 45% of reimbursements received by Vantari for VBH-generated referrals.  The monthly payment for each "'active' Contractor Representative" remained the same.

63.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to UMT and VBH to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Timothy Armstrong** and **Virginia Blake Herrin**, acting through UMT and VBH, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 8/18/2014 | $5,050.60 | UMT |
| b. | 9/9/2014 | $25,000.00 | UMT |
| c. | 9/17/2014 | $9,113.55 | UMT |
| d. | 10/15/2014 | $41,018.79 | UMT |
| e. | 11/14/2014 | $50,000.00 | UMT |
| f. | 11/14/2014 | $53,627.99 | UMT |
| g. | 12/15/2014 | $85,058.36 | UMT |
| h. | 1/15/2015 | $60,146.87 | VBH |
| i. | 2/17/2015 | $56,765.81 | VBH |
| j. | 2/17/2015 | $50,000.00 | VBH |
| k. | 2/27/2015 | $25,000.00 | VBH |
| l. | 3/16/2015 | $80,247.88 | VBH |
| m. | 4/15/2015 | $95,555.05 | VBH |
| n. | 5/8/2015 | $361.28 | VBH |
| o. | 5/15/2015 | $204,396.51 | VBH |
| p. | 6/15/2015 | $150,683.14 | VBH |
| q. | 6/17/2015 | 40,500.00 | VBH |
| r. | 7/15/2015 | 294,259.83 | VBH |
| s. | 8/14/2015 | 178,347.81 | VBH |
| t. | 8/19/2015 | $81,082.11 | VBH |
| u. | 8/21/2015 | $39,500.00 | VBH |
| v. | 9/15/2015 | $90,610.47 | VBH |
| w. | 10/15/2015 | $103,791.59 | VBH |
| x. | 11/18/2015 | 100,442.52 | VBH |
| y. | 12/15/2015 | $57,835.96 | VBH |
| z. | 1/15/2016 | $39,843.26 | VBH |
| aa. | 2/12/2016 | $36,367.88 | VBH |
| bb. | 3/15/2016 | $37,143.01 | VBH |
| cc. | 4/15/2016 | $21,118.35 | VBH |
| dd. | 4/21/2016 | $2,013.15 | VBH |
| ee. | 5/13/2016 | $23,168.34 | VBH |
| ff. | 6/15/2016 | $10,598.57 | VBH |
| gg. | 6/28/2016 | $911.41 | VBH |

Unindicted Co-Conspirator 2

64.    On or about March 11, 2015, Unindicted Co-conspirator 2 entered into a verbal agreement with **Timothy Armstrong** for the referral of and arranging for health care business.  According to the agreement, Unindicted Co-conspirator 2 would receive $200 for each referral she generated.

65.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Timothy Armstrong** and **Virginia Blake Herrin**, acting through UMT and VBH, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Unindicted Co-conspirator 2 to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and Unindicted Co-conspirator 2 knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|--------------|--------|-------------------|
| a. | 5/15/2015 | $745.13 | Unindicted Co-conspirator 2 |
| b. | 5/15/2015 | $27,831.00 | Unindicted Co-conspirator 2 |
| c. | 6/22/2015 | $3,000.00 | Unindicted Co-conspirator 2 |
| d. | 6/22/2015 | $60,305.69 | Unindicted Co-conspirator 2 |
| e. | 7/20/2015 | $129,307.61 | Unindicted Co-conspirator 2 |
| f. | 8/26/2015 | $96,814.00 | Unindicted Co-conspirator 2 |
| g. | 9/16/2015 | $29,846.26 | Unindicted Co-conspirator 2 |
| h. | 12/4/2015 | $39,742.57 | Unindicted Co-conspirator 2 |
| i. | 12/18/2015 | $18,108.23 | Unindicted Co-conspirator 2 |
| j. | 12/18/2015 | $10,005.14 | Unindicted Co-conspirator 2 |
| k. | 1/14/2016 | $9,899.00 | Unindicted Co-conspirator 2 |
| l. | 1/25/2016 | $4,188.03 | Unindicted Co-conspirator 2 |
| m. | 5/11/2016 | $47,500.00 | Unindicted Co-conspirator 2 |
| n. | 9/27/2016 | $8,500.00 | Unindicted Co-conspirator 2 |

## Ashley Kretzschmar

66.     On or about October 17, 2013, **Ashley Kretzschmar** entered into a written agreement with Vantari for the referral of and arranging for health care business. According to the agreement, **Ashley Kretzschmar** would receive $200 for each referral she generated.

67.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Ashley Kretzschmar** to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program

and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Ashley Kretzschmar** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 12/2/2013 | $14,328.09 | Ashley Kretzschmar |
| b. | 12/13/2013 | $4,170.16 | Ashley Kretzschmar |
| c. | 1/3/2014 | $457.17 | Ashley Kretzschmar |
| d. | 1/15/2014 | $1,000.14 | Ashley Kretzschmar |
| e. | 2/3/2014 | $446.00 | Ashley Kretzschmar |
| f. | 2/15/2014 | $2,228.87 | Ashley Kretzschmar |
| g. | 3/3/2014 | $2,023.58 | Ashley Kretzschmar |
| h. | 3/17/2014 | $2,735.30 | Ashley Kretzschmar |
| i. | 4/11/2014 | $12,892.08 | Ashley Kretzschmar |
| j. | 5/15/2014 | $4,933.40 | Ashley Kretzschmar |
| k. | 6/16/2014 | $4,206.12 | Ashley Kretzschmar |
| l. | 7/15/2014 | $1,161.13 | Ashley Kretzschmar |
| m. | 8/15/2014 | $112.01 | Ashley Kretzschmar |
| n. | 9/17/2014 | $122.06 | Ashley Kretzschmar |
| o. | 10/15/2014 | $201.08 | Ashley Kretzschmar |
| p. | 4/15/2015 | $52.14 | Ashley Kretzschmar |

**Patrick Ridgeway and RenRx**

68.     On or about December 22, 2014, the same day that CMS suspended RenRx's Medicare payments based on "credible allegations of fraud," **Patrick Ridgeway**

communicated by phone and email with **Nicolas Arroyo** in order to negotiate a kickback arrangement.

69.     Between December 22, 2014, and December 23, 2014, **Patrick Ridgeway** entered into a verbal agreement with **Nicolas Arroyo** for the referral of and arranging for health care business.  According to the agreement, RenRx would receive 50% of reimbursements received by Vantari for RenRx-generated referrals.

70.     On or about December 26, 2014, RenRx entered into a written agreement with Vantari for the referral of and arranging for health care business.  According to the agreement, RenRx would provide marketing, training, and other customer-related services to Vantari.  In exchange, RenRx was to receive $6,000,000 per month.  RenRx would be paid according to the following schedule:

| Payment Date | Payment Amount |
|---|---|
| January 15, 2015 | $1,000,000 |
| January 30, 2015 | $2,000,000 |
| February 15, 2015 | $3,750,000 |
| February 30, 2015 | $3,750,000 |
| March 15, 2015 | $3,750,000 |
| March 30, 2015 | $3,750,000 |
| April 15, 2015 | $3,000,000 |
| April 30, 2015 | $3,000,000 |
| May 15, 2015 | $3,000,000 |
| May 30, 2015 | $3,000,000 |
| June 15, 2015 | $3,000,000 |
| June 30, 2015 | $3,000,000 |
| July 15, 2015 | $3,000,000 |
| July 30, 2015 | $3,000,000 |
| August 15, 2015 | $3,000,000 |
| August 30, 2015 | $3,000,000 |
| September 15, 2015 | $3,000,000 |
| September 30, 2015 | $3,000,000 |
| October 15, 2015 | $3,000,000 |

| Payment Date | Payment Amount |
|---|---|
| October 30, 2015 | $3,000,000 |
| November 15, 2015 | $3,000,000 |
| November 30, 2015 | $3,000,000 |
| December 15, 2015 | $3,000,000 |
| December 30, 2015 | $3,000,000 |
| January 15, 2016 | $3,000,000 |
| January 30, 2016 | $3,000,000 |

In the "Vantari 1099 Contractor Agreement," the parties stipulated that the compensation was reasonable, was at fair market value, had been determined through arm's length negotiations, and had not been determined in a manner that took into account the volume or value of referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or any federal or state health care program or under any other third party payer program.  These stipulations are false.

71.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, **Philip Lamb**, **Nicolas Arroyo**, and others, acting through Vantari, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to RenRx to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Patrick Ridgeway**, acting through RenRx, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring Medicare

beneficiaries for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 1/21/2015 | $1,000,000.00 | RenRx |
| b. | 1/30/2015 | $1,000,000.00 | RenRx |
| c. | 2/9/2015 | $1,000,000.00 | RenRx |
| d. | 2/23/2015 | $1,500,000.00 | RenRx |
| e. | 3/4/2015 | $2,250,000.00 | RenRx |
| f. | 3/19/2015 | $1,250,000.00 | RenRx |
| g. | 4/6/2015 | $250,000.00 | RenRx |

**Laboratory 2, Codon, Genematrix, ALS, and Vivo**

72.     On or about September 2, 2014, Genematrix entered into a written agreement with Laboratory 2 for the referral of and arranging for health care business. According to the agreement, Genematrix would receive 25% of reimbursements received by Laboratory 2 for Genematrix-generated referrals.  The agreement also stipulated to monthly billable sample volume minimums.

73.     On or about March 11, 2015, Codon entered into a written agreement with Laboratory 2 for the referral of and arranging for health care business.  According to the agreement, Codon would receive 50% of reimbursements received by Laboratory 2 for Codon-generated referrals.  Like KNM Global, Codon was a company controlled by **Nicolas Arroyo** and Unindicted Co-conspirator 1.  Codon was unknown to **Philip Lamb**.

74.     On or about April 14, 2015, **Nicolas Arroyo**, **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, and Unindicted Co-conspirator 1 exchanged email communications discussing the packaging and handling of Laboratory 2 PGx samples which were scheduled to arrive at Vantari's distribution center in Tempe, Arizona.

75.     On or about July 15, 2015, **Nicolas Arroyo** sent an email to Codon personnel wherein he instructed Codon personnel to pay 40% of reimbursements received by Codon on any Texas business to ALS and to pay 40% of reimbursements received by Codon on any New York business to Genematrix.

76.     On or about December 1, 2015, the Genematrix agreement was amended and the amount was increased to 35% of reimbursements received by Laboratory 2 for Genematrix-generated referrals.  The agreement also included a number of additional sales incentive provisions.

77.     On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, a portion of which constituted illegal remunerations, Laboratory 2 knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Codon and Genematrix to induce the referral of and arranging for the furnishing of any item and service for which for which payment may be made in whole and in part under the Medicare program and in return for arranging for the ordering of any service and item for which payment may be made in whole and in part under the Medicare program; and **Nicolas Arroyo** and Unindicted Co-conspirator 1, acting through Codon, and **Steven Donofrio**, acting through Genematrix, knowingly and willfully

received remuneration, including any kickback, directly and indirectly, overtly and

covertly, in cash and in kind, in return for referring Medicare beneficiaries for the

furnishing and arranging for the furnishing of any item and service for which payment

may be made in whole and in part under the Medicare program and in return for

arranging for the ordering of any service and item for which payment may be made in

whole and in part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/29/2015 | $41,262.10 | Genematrix |
| b. | 6/30/2015 | $20,556.78 | Genematrix |
| c. | 6/30/2015 | $1,948.69 | Codon |
| d. | 7/31/2015 | $21,222.31 | Genematrix |
| e. | 7/31/2015 | $28,855.90 | Codon |
| f. | 8/31/2015 | $40,716.72 | Genematrix |
| g. | 8/31/2015 | $36,274.27 | Codon |
| h. | 9/30/2015 | $16,542.16 | Genematrix |
| i. | 9/30/2015 | $14,618.72 | Codon |
| j. | 10/30/2015 | $22,365.30 | Genematrix |
| k. | 10/30/2015 | $11,117.85 | Codon |
| l. | 12/31/2015 | $7,149.46 | Genematrix |
| m. | 12/31/2015 | $12,859.80 | Codon |
| n. | 2/1/2016 | $1,527.59 | Genematrix |
| o. | 2/1/2016 | $1,215.05 | Codon |
| p. | 2/29/2016 | $3,631.14 | Genematrix |
| q. | 4/1/2016 | $3,390.87 | Genematrix |
| r. | 4/1/2016 | $2,984.92 | Codon |

78.    On or about the dates specified below in the payment date column, to the

particular entity or individual specified, and in the amounts specified, a portion of which

constituted illegal remunerations, **Steven Donofrio**, acting through Genematrix,

knowingly and willfully paid remuneration, including any kickback, directly and

indirectly, overtly and covertly, in cash and in kind, to ALS in return for arranging for the

ordering of any service and item for which payment may be made in whole and in part

under the Medicare program; and **Vincent Marchetti, Jr.** and **Williams Flowers**, acting

through ALS, knowingly and willfully received remuneration, including any kickback,

directly and indirectly, overtly and covertly, in cash and in kind, in return for arranging

for the ordering of any service and item for which payment may be made in whole and in

part under the Medicare program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 8/7/2015 | $9,611.12 | ALS |
| b. | 9/14/2015 | $5,690.39 | ALS |
| c. | 9/28/2015 | $475.22 | ALS |
| d. | 10/13/2015 | $3,831.74 | ALS |
| e. | 10/29/2015 | $528.36 | ALS |
| f. | 11/18/2015 | $1,345.29 | ALS |
| g. | 11/25/2015 | $200.00 | ALS |
| h. | 12/23/2015 | $1,179.61 | ALS |
| i. | 1/29/2016 | $1,560.61 | ALS |
| j. | 2/26/2016 | $521.00 | ALS |

All in violation of 18 U.S.C. § 371.

## **NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE**
### Pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c)

1.    The allegations contained in Count 1 this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.    Upon conviction of any violation of 18 U.S.C. § 371, the defendants, **Philip Lamb**, **Nicolas Arroyo**, **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, **James J. Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**, **Patrick Ridgeway**, **Chismere Mallard**, **Ray W. Ng**, and **Ashley Kretzschmar**, shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3.    Upon conviction of any Federal health care offense, the defendants, **Philip Lamb**, **Nicolas Arroyo**, **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, **James J. Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**, **Patrick Ridgeway**, **Chismere Mallard**, **Ray W. Ng**, and **Ashley Kretzschmar**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

4.      Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

      a.   Cannot be located upon the exercise of due diligence;

      b.   Has been transferred, or sold to, or deposited with a third party;

      c.   Has been placed beyond the jurisdiction of the Court;

      d.   Has been substantially diminished in value; or

      e.   Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of the defendants, **Philip Lamb**, **Nicolas Arroyo**, **Vincent Marchetti, Jr.**, **William Flowers**, **Steven Donofrio**, **James J. Walker, Jr. a/k/a Jimmy Walker**, **Timothy Armstrong**, **Virginia Blake Herrin**, **Patrick Ridgeway**, **Chismere Mallard**, **Ray W. Ng**, and **Ashley Kretzschmar**.

5.      The property which is subject to forfeiture, includes but is not limited to the following:

      a)      <u>Bank/Investment Accounts:</u>

- $167,595.55 in funds seized from bank account xxxxxx5763 at Wells Fargo Bank in the name of FLO Vascular, LLC;

- $107,172.63 in funds seized from a Vanguard SEP-IRA account in the name of James J. Walker, Jr.; and

- $483,547.00 in funds seized from bank account xxxx5594 at Interactive Brokers, LLC, in the name of James J. Walker, Jr. and Christine W. Walker.

b)   <u>Cash Proceeds:</u>

A sum of money equal to $36,282,569.60 in United States currency, and all interest and proceeds traceable thereto, representing the proceeds of the offense, for which the defendants are personally liable.

6.      By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____12/11/19_____                                  _____
Date                                                                        GRAND JURY FOREPERSON

JOSEPH D. BROWN
UNITED STATES ATTORNEY

_____
NATHANIEL C. KUMMERFELD
ASSISTANT UNITED STATES ATTORNEY

Indictment – Page 59

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 5:19-CR- |
| v. | § | JUDGE _____ |
| | § | |
| PHILIP LAMB (01) | § | |
| NICOLAS ARROYO (02) | § | |
| VINCENT MARCHETTI, JR. (03) | § | |
| WILLIAM FLOWERS (04) | § | |
| STEVEN DONOFRIO (05) | § | |
| JAMES J. WALKER, JR. (06) | § | |
| a/k/a JIMMY WALKER | § | |
| TIMOTHY ARMSTRONG (07) | § | |
| VIRGINIA BLAKE HERRIN (08) | § | |
| PATRICK RIDGEWAY (09) | § | |
| CHISMERE MALLARD (10) | § | |
| RAY W. NG (11) | § | |
| ASHLEY KRETZSCHMAR (12) | § | |

## NOTICE OF PENALTY

## COUNT 1

VIOLATION:        18 U.S.C. § 371
Conspiracy to Commit Illegal Remunerations

PENALTY:        Imprisonment of not more than five (5) years; the greater of a
fine not to exceed $250,000, a fine not to exceed two times
the gross gain to the Defendant, or a fine not to exceed two
times the loss to the victim, or both such imprisonment and
fine; and a term of supervised release of not more than three
(3) years.

SPECIAL ASSESSMENT:$100.00